### In re STOKES.

(District Court, S. D. Georgia, E. D. December 30, 1910.)

1. BANKRUPTCY (§ 446*)—REFEREE'S ORDER—REVIEW.

A review of a referee's order, requiring a bankrupt to pay over money alleged to have been withheld from his trustee, may be properly restricted to the referee's report, the evidence to which he refers therein, and to such evidence as the petitioner may include in his exceptions to the referee's finding.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 446.*]

2. BANKRUPTCY (§ 136*)—CONCEALED ASSETS—FINDINGS—EVIDENCE.

Evidence held to justify a referee's finding that a bankrupt had withheld and concealed a part of the proceeds of real property sold prior to the filing of his petition, and requiring payment thereof to the trustee.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 136.*]

In the matter of bankruptcy proceedings of M. A. Stokes. On petition to review a referee's order requiring a bankrupt to pay over certain funds to a trustee. Order affirmed.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

D. H. Clark, for bankrupt.
George W. Owens, for trustee.

SPEER, District Judge. This is a petition on behalf of the trustee for the bankrupt, praying the referee to oblige the bankrupt to pay over the sum of $3,470, which it is alleged that the latter received from the sale of certain real estate. This was a few days before he filed his voluntary petition in bankruptcy. After a hearing, the referee granted an order that the bankrupt pay to the trustee $1,700.58. In default of such payment, the trustee was directed to institute proceedings against the bankrupt in accordance with the provisions of section 29 of the act (Act July 1, 1898, c. 541, 30 Stat. 554 [U. S. Comp. St. 1901, p. 3433]).

From this order the bankrupt has presented a petition for review, on the general grounds that the order is contrary to law and to the principles of justice and equity, is contrary to the evidence, and decidedly and strongly against the weight of evidence. He further excepts to certain findings of fact.

The referee made the following findings:

"M. A. Stokes, the bankrupt, prior to his adjudication, had been doing the business of a ribbon and notion merchant in Savannah, Ga. On July 25, 1908, he filed a voluntary petition in bankruptcy, and was on the same day regularly adjudicated a bankrupt. Five days before this, to wit, on July 20, 1908, his nephew, Henry W. Jenkins, doing a livery stable business in Savannah, Ga., had filed his voluntary petition in bankruptcy. About a week before this, to wit, on July 14, 1908, at a time when the circumstances would indicate that he had bankruptcy in contemplation, Stokes went to Varnville, S. C., where he owned two pieces of real estate, one piece a town lot, with improvements thereon, and the other a farm adjacent, containing 297 acres, and disposed of the same to one W. O. Thompson, a resident of Varnville, for $2,000. Four days later, on July 18, 1908, he returned to Varnville, and sold to Thompson for $1,470 a third piece of real estate, which was situated in Savannah, Ga. Subsequent to the sale of this real estate, as stated above, he went into bankruptcy on July 25, 1908. When the stock of goods at the store in Savannah was sold, under order of the bankruptcy court, on August 26, 1908, Thompson, who bought the real estate, came to Savannah and bid in the stock of goods for $2,700. It developed that he came to Savannah in response to telegrams from Stokes, one dated August 22, 1908, as follows: "Yes; want you to furnish money to buy stock." The other telegram, dated August 25, 1908, was as follows: "Come to Savannah on to-day's train."

The creditors, suspecting that the previous real estate sales were merely colorable and a part of a collusive scheme, had Thompson and Stokes examined under oath on August 27 and 28, 1908. Both testified positively that Thompson paid down cash to Stokes at the time of the execution of the deeds, to wit, on July 14 and 18, 1908.

It is thus established that the bankrupt, M. A. Stokes, received in cash $2,000 eleven days before the adjudication, and $1,470 one week before his adjudication; total, $3,470. No part of this money is accounted for in the schedule filed by him.

Of the 17 items, showing payments to certain parties, and the amounts thereof, set out in his answer, no contest was made by the trustee on the hearing, except as to the item of $450 claimed to have been paid to his wife, Mrs. F. A. Stokes, $500 claimed to have been paid to his nephew, Henry W. Jenkins, and $998 claimed to have been paid to his sister, Mrs. C. V. Tuten; also the sum of $202.58 claimed to have been paid to the Citizens' & Southern Bank on checks given by Stokes.

We will first take up the item of $998 alleged by Stokes to have been paid his sister, Mrs. C. V. Tuten. At the hearing on the rule, in support of the statement in his answer that he had paid this large amount to his sister, he produced a promissory note, which is as follows:

"$998.00.                                      Savannah, Ga., March 17, 1908.

"July 17th, after date, I promise to pay to the order of Mrs. C. V. Tuten nine hundred and ninety-eight dollars, at 14 Broughton Street, East.

                                            "M. A. Stokes.

Indorsed on back: "Paid July 17, 1908. Mrs. C. V. Tuten."

In regard to this note it will be noticed that, having been previously twice examined under oath, and particularly interrogated as to the disposition of this fund, Stokes failed to remember or disclose this disbursement. When confronted by the serious formal demand of the trustee in this proceeding, he descended for the first time from vague statements of payment to his commercial neighbors "and others" to this particular. While he was yet testifying to the time, place, and circumstances under which this alleged promissory note was given and paid, and before opportunity to compare notes, the creditors had his sister, Mrs. C. V. Tuten, subpœnaed and brought into court. Agreeing as to the main fact of the note, its payment, her account of the details as to the time, place, and circumstances of the loan, and the execution of the note, were so discordant with his statement as to utterly discredit both. After careful consideration of the demeanor of the witnesses while being examined, their intimate relationship, their variation in testimony with regard to a sum of money which was large enough to impress the time, place, and circumstances of the loan upon the mind of the borrower and lender, the referee finds that this note was fictitious, and that no such money was loaned by the sister to the brother, and no such note was ever executed as claimed by the respondent, Stokes. The whole scheme was an afterthought, an attempt to make a showing in response to the formal demand of the trustee.

Was this money ever paid over as claimed in the answer by Stokes to Mrs. Tuten, his sister? We have his testimony that he sent it to her by his nephew, H. W. Jenkins, and her testimony that she received it from Henry Jenkins, at Furman, S. C. It is significant that, on the hearing on this rule, H. W. Jenkins was not called in to testify. It is equally significant that, when Henry Jenkins was examined under oath in this case on August 28, 1908, and specifically interrogated as to what Stokes had done with this money derived from the sale of the real estate, he said "that he did not know to whom Stokes paid this money; that he did not know anything about Stokes' private affairs."

The referee, therefore, feels warranted in finding that the bankrupt, Stokes, still has this money in his possession, custody, or control, and that he should be required to produce the same.

For the reason that Henry Jenkins testified that he knew nothing of what disposition Stokes made of the money derived from the sale of the realty, and that Stokes cannot give time, place, or circumstances, or produce any receipts for the payments alleged by him to have been made to Jenkins, his nephew, who himself went into bankruptcy five days ahead of Stokes, to wit, on July 20, 1908—the real estate money having been received by Stokes, $2,000 on July 14th, and $1,470 on July 18th—the referee finds that the $500 alleged to have been paid by Stokes to Henry W. Jenkins was not paid, and that the same is still in the possession, custody, or control of the bankrupt, Stokes, and that he is wrongfully withholding the same from his creditors.

With regard to the $202.58, alleged to have been deposited by Stokes in the Citizens' & Southern Bank between July 15th and July 25th, the statement of the bank is in evidence. On the 15th of July there was deposited $47.18; on the 16th, $72.50; on the 17th, $5.90; on the 18th, $10; on the 20th, $5; on the 23d, $9; and on the 25th, $5. The account closes, leaving a balance of 30 cents. From the fact that these deposits run in small amounts, it is probable that they were derived from daily sales from the store on Broughton street, which was conducted up to the 25th. It is improbable that they formed any part of the $2,000 received by Stokes on the 14th, or of the $1,-

470 received by him on the 18th, at Varnville, S. C. He has made no account to the trustee of the disposition of the amounts received from the daily sales in his store. His accounts with all the banks with which he did business were put in evidence. None of them show the deposit of these two large sums. Having admittedly come into his possession only a few days before bankruptcy, the burden is on him to show the disposition of them. The referee finds from the evidence that the $202.58, of small deposits above mentioned, formed no part of the two large sums received from the sale of this real estate, and that that amount is also still in his possession, custody, or control, and that he is wrongfully withholding it from his creditors."

After careful consideration, I see no reason which would justify a difference with the referee. The inquiry by this court might well have been restricted, under the well-known rule, to the report of the referee, and the evidence to which he refers therein, and to such evidence as the petitioner for review has set forth in his exceptions to the referee's finding. I have, however, additionally considered a great volume of evidence taken before the referee on the two hearings had antecedent to that which resulted in the order now under consideration. I have also considered copies of the statements from each of the banks with whom the bankrupt had been doing business. The entire record fully justifies the findings of the referee, which are affirmed, and the petition for review is denied.

Let an order be taken accordingly.